Willard Skaggs, Jr., an Infant, by Doris Skaggs, His Mother and Next Friend, Plaintiff-Appellant, v. John Junis, Defendant-Appellee.

**Gen. No. 11,364.**

Second District, Second Division.
October 17, 1960.
Rehearing denied November 9, 1960.

Perona and Perona, of Spring Valley, and L. D. Spaulding, Jr., of Princeton, for appellant.

Peterson and Johnson, of Princeton, Welch and Welch, of Kewanee, for appellee.

PER CURIAM.

This is an action to recover damages for personal injuries suffered by a minor child on July 31, 1955. The plaintiff, Willard Skaggs, Jr., a sixteen year old boy, became paralyzed from the neck down as a result of diving into an artificial pond on defendant John Junis' farm land when he allegedly struck his head on a submerged stump hidden from view beneath the water. The two-count amended complaint consisted of a wil-

ful and wanton misconduct count designated Count I and a general negligence count designated Count II. At the end of the plaintiff's case the trial court denied defendant's motion for a directed verdict as to both counts. During the presentation of evidence for defendant, the court vacated its prior decision and directed a verdict for defendant on Count II, the general negligence count. The jury returned a verdict of not guilty on Count I, and judgment was entered on the verdict. The plaintiff filed a post trial motion asking for a judgment notwithstanding the verdict and for a new trial, which was denied. This appeal followed.

Count I of the plaintiff's complaint alleged that prior to the date of plaintiff's injuries, defendant had constructed on his farm premises a pond, picnic and meeting grounds, and that he had invited and knowingly permitted the public to use the same for swimming and recreation; that defendant had knowingly, wilfully, and wantonly permitted various stumps to remain completely hidden from sight in his pond; that plaintiff had been severely injured and damaged by diving into the pond and striking a submerged stump; that under the circumstances alleged, the defendant had a duty to warn the plaintiff of the submerged stumps or to remove them, both of which he failed to do; and that plaintiff was injured as a result of such wilful and wanton misconduct. Count II realleged the essential allegations of Count I but also set forth in substance that on July 31, 1955, and long prior thereto, children were accustomed to use defendant's premises for swimming and diving and that the premises and pond were an allurement and attraction for children of all ages, which defendant knew or by the exercise of ordinary care should have known. By his answer defendant admitted ownership of the land and construction of the pond but denied the remaining allegations of Counts I and II. In addition, defendant by

way of affirmative defense asserted as to Count I that plaintiff was injured as a result of his own wilful and wanton misconduct, and as to Count II that he was a trespasser or a bare licensee to whom defendant owed only the duty not to wilfully and wantonly cause him injury; that being over fourteen years of age plaintiff is held to the same degree of care for his own safety as an adult and therefore the doctrine of attractive nuisance is not available to him.

The defendant owned a 60 acre tract in rural Bureau County consisting of permanent pasture and timber, and to provide water for cattle he built an earthen dam across a ravine, felling some trees in the area behind the dam. The ravine filled with water creating a pond which was 18 feet deep at its deepest part. Defendant built a cabin nearby and kept a boat, inner tubes and picnic table in the adjacent wooded area. The tract, which was fenced, was some distance from the public highway, but was at least partially visible from the highway. In 1954 various adults and children started to use the pond for swimming and diving and used the premises for picnics and outings. Most of them obtained defendant's express permission but some did not. Before July 31, 1955, on about twelve occasions, defendant saw persons he did not know swimming in the pond and on fifty or more occasions saw various groups swimming there. One submerged stump in the pond was about 58 feet south of the dock and some 13 feet from shore, extended 2½ feet from the bottom of the pond, and was covered by about 1½ feet of water. The stump was cut on the bevel at the top; it was not marked; and there were no posted warnings regarding the presence of submerged stumps.

The plaintiff, aged 16, who had then just completed his freshman year of high school, heard about the pond and its attractions from one or both of the Winefordner boys, his friends, who had express permission

254

to swim in the pond. On a particular day in May, 1955, Willard Skaggs and his younger brother, another schoolmate, and one of the Winefordner boys went out to the pond premises. They cut across the farm fields in going to the pond from the farm house where the Winefordners lived. When the boys arrived at the pond the defendant was there. One of the boys other than the plaintiff said something to the defendant. The only thing that anyone remembered as actually having been said was that the defendant said in substance: "Isn't it a little too cold to go swimming?"

At the conclusion of the conversation the boys, not having swimming suits with them, went down to a secluded part of the pond and tried the water but, finding it too cool, did not stay in the water and returned home. At this time Willard Skaggs could swim and dive, having learned when he was in fifth grade.

Between the first time in May and July 31, 1955, the plaintiff went out to the pond with various friends and schoolmates of his on 15 occasions. On 12 or 13 of the 15 times there were others swimming in the pond when he went there. On at least 11 of those occasions he accompanied one of the Winefordner boys. On about six of those 15 occasions the plaintiff saw the defendant on the pond premises while he and the other boys swam and dove in the pond. On one occasion the defendant gave the plaintiff and one of the Winefordner boys a ride in the defendant's boat. Prior to July 31, 1955, the defendant did not know the plaintiff's name or where he lived but he remembered having seen him at the pond two or three times. While defendant never gave the plaintiff express permission to swim in his pond, at no time did the defendant ever tell the plaintiff to leave the premises or not to swim in the pond. The only occasion on which the defendant ever asked anyone to leave the premises was one evening when some strange boys

255

started to throw each other into the pond with their clothes on. The defendant never told the plaintiff or anyone else about the stumps, which were not visible and were covered by water in the pond. However, the defendant told Bill Winefordner, to whom he had given permission to swim in the pond, that he should not swim alone. On July 31, 1955, the defendant was at the pond premises and saw the boys swimming and diving into the pond and recognized the Winefordner boy, who was one of the boys accompanying the plaintiff, to whom he had given express permission to swim in the pond, but did not recognize the plaintiff. On that day the defendant saw the boys diving into the pond from the shore as far as 20 feet south of the dock.

On the date in question, a Sunday, defendant had granted permission to the local fire department to use the pond in the afternoon to conduct fire-fighting demonstrations and contests to which the general public was invited. The plaintiff ran down the bank many times that day and dove into the water between the dock and a large oak tree from a limb of which a rope hung out over the water. Around noon, as the arrival of spectators increased, the swimmers moved south of the dock. In the course of a dive from the shore plaintiff sustained the serious injuries complained of, when he allegedly struck the submerged stump located 58 feet south of the dock.

The defendant contended that Willard Skaggs did not strike a submerged stump but merely the pond floor, and there was conflicting evidence on the point. Although none of the stumps had been previously marked, the defendant on July 31, 1955, after plaintiff was injured, placed two ten foot lengths of pipe on either side of the stump and wired the tops together in a triangular fashion.

It is the plaintiff's theory as to Count II, the "attractive nuisance" count, that the question of defendant's negligence and liability were properly jury questions. As to Count I, it is plaintiff's theory that reversible error was committed in certain rulings on the admission of evidence, in refusing two of plaintiff's instructions, and in not compelling the defendant to answer certain interrogatories before trial, as well as for certain additional reasons.

The trial court, shortly after the defendant began presentation of his evidence, vacated its prior ruling and granted defendant's motion for a directed verdict as to Count II. While the trial judge inadvertently stated that his ruling was a "dismissal" of Count II, it is plain that he intended and the parties understood that his order amounted to the directing of a verdict in favor of the defendant upon the latter's motion. It was evidently the opinion of the trial court (1) that the pond and premises in question could not, as a matter of law, constitute an attractive nuisance, or (2) that the age of the plaintiff made the attractive nuisance doctrine inapplicable, or (3) that plaintiff, being either a trespasser or a bare licensee, even though his presence was known to the defendant, was only owed a duty not to be injured as a result of the defendant's wilful and wanton misconduct.

Plaintiff-appellant relies strongly upon Kahn v. James Burton Co. (1955), 5 Ill.2d 614, 126 N.E.2d 836. Several Appellate Courts have recognized that said case marks a distinct departure from the traditional standards developed by the law in cases in which children are attracted to and trespass upon premises and are injured as a result thereof. As one court observed, all cases of this character must be examined in the light of the Kahn case, and prior authorities must yield to the principles set forth in that decision:

257

Runions v. Liberty Nat. Bank (1957), 15 Ill.App.2d 538, 540, 147 N.E.2d 380. Prior to the Kahn decision, cases of this kind were set apart and categorized as "attractive nuisance" cases. In the Kahn case, the Supreme Court deplored this inclination to find a "stare decisis pigeonhole or category." The Court noted the difficulty in such procedure in that too often the result of such a search is the reaching of irreconcilable conclusions. The court cited instances of confusion in decisions and in so doing observed that: ". . . Another class of cases deal with watercourses, ponds and lakes. Yet liability has been sustained in these cases where it appears the water caused the drowning. The courts then declare that the water in itself cannot be the attraction for a case of liability but that other objects must have attracted the children. It has been ruled that the complaint must allege such attractive objects as floating logs, rafts, boardwalks, tree stumps, bottles, containers, etc., even though the injury or death complained of was not in the least occasioned by the attracting objects. In view of the foregoing conflict and the fact that, as many courts have declared, a child in his youthful fancy, imagination and ingenuity can make a plaything of almost anything and is attracted by almost everything, the only proper basis for decision in such cases dealing with personal injuries to children are *the customary rules of ordinary negligence cases*. (Emphasis supplied.)

"It is generally true, as defendant contends, that an owner or one in possession and control of premises is under no duty to keep them in any particular state or condition to promote the safety of trespassers or others who come upon them without any invitation, either express or implied. (Briney v. Illinois Cent. R. Co., 401 Ill. 181, 81 N.E.2d 866; Darsch v. Brown, 332 Ill. 592, 164 N. E. 177) It is also established that

infants, as a general rule, have no greater rights to go upon the land of others than adults, and that their minority of itself imposes no duty upon the occupier of land to expect them or prepare for their safety. (Burns v. Chicago, 338 Ill. 89, 169 N. E. 811; McDermott v. Burke, 256 Ill. 401, 100 N. E. 168.) It is recognized, however, that an exception exists where the owner or person in possession knows, or should know, that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury to them because they, by reason of their immaturity, are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children. *In such cases there is a duty upon the owner or other person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it.* (Wagner v. Kepler, 411 Ill. 368, 104 N.E.2d 231.) *The element of attraction is significant only in so far as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeability of harm to the child.* Whether the lumber pile was sufficiently attractive to entice children into climbing upon it, whether its condition would involve danger from such activity, and whether the contractor should have anticipated the probability of the accident, were matters for determination by the jury. City of Pekin v. McMahon, 154 Ill. 141, 39 N. E. 484." (Emphasis supplied.)

▮▮▮▮ Giving the principles of the Kahn case their full import, and applying them to the facts in the instant case, the conclusion seems irresistible that the issues as to whether the pond and premises were sufficiently attractive to entice the plaintiff as to entering them, whether the condition of the pond and premises were such as to create an unreasonable

259

danger to children frequenting them, whether the defendant should reasonably have foreseen harm to children from the condition of his pond and premises, and whether the plaintiff was guilty of contributory negligence, were questions for the jury under the circumstances shown in the record. We find further support for this conclusion in the following decisions handed down since the Kahn case was decided: Halloran v. Belt Ry. Co. of Chicago, 25 Ill.App.2d 114, 166 N.E.2d 98; Wilinski v. Belmont Builders, Inc. (1957), 14 Ill.App.2d 100, 143 N.E.2d 69; Kleren v. Bowman (1957), 15 Ill.App.2d 148, 145 N.E.2d 810; Runions v. Liberty Nat. Bank (1957), 15 Ill.App.2d 538, 147 N.E.2d 380; Melford v. Gaus & Brown Const. Co., Inc. (1958), 17 Ill.App.2d 497, 151 N.E.2d 128. It is firmly established that in determining the question of due care the factors of experience, intelligence, and capacity must be considered in the case of a minor over 14 years of age, Cicero State Bank v. Dolese & Shepard Co. (1939), 298 Ill. App. 290, 18 N.E.2d 574; Kleren v. Bowman (1957), 15 Ill.App.2d 148, 145 N.E.2d 810; Wolf v. Budzyn (1940), 305 Ill. App. 603, 27 N.E.2d 571. The evidence discloses that the defendant provided not only an artificial pond for numerous persons to use and enjoy, but, in addition, a boat, inner tubes, and picnic table, and that he permitted, if not encouraged, the practice of using the facilities without his express permission, even in the case of small children. With regard to the age of the plaintiff, it is our conclusion that the fact that he was 16 years and 2 months' old at the time of the occurrence does not prevent the principles of the Kahn case from applying. While the plaintiff was 16 years of age, he had just completed his freshman year of high school. Moreover, the question of contributory negligence, as hereinabove noted, is pre-eminently a question for the jury to determine in the light of the plaintiff's capacity,

intelligence, and experience. Decisions in Illinois and other jurisdictions, make it clear that the fact that the plaintiff is in excess of 14 years of age does not bar him from a recovery in a case such as this: Kleren v. Bowman (1957), 15 Ill.App.2d 148, 145 N.E.2d 810 (age 14); Cicero State Bank v. Dolese & Shepard Co. (1939), 298 Ill. App. 290, 18 N.E.2d 574 (age 14); Johns v. Fort Worth Power & Light Co., 30 S.W.2d 549, (age 15, past); MacNeil v. Perkins, 84 Ariz. 74, 324 P.2d 211, (ages 11, 13, and 16); Erickson v. W. J. Gleason Co., 145 Minn. 64, 176 N. W. 199 (age 15); Schorr v. Minnesota Utilities Co., 203 Minn. 384, 281 N. W. 523 (age 16); Ekdahl v. Minnesota Utilities Co., 203 Minn. 374, 281 N. W. 517 (1938) (age 15).

The defendant points out that at no time was the jury instructed that the trial court had directed a verdict against the plaintiff and in favor of the defendant as to Count II. This omission, which was acquiesced in by both plaintiff and defendant, does not affect our decision. It is obvious from the instructions given and from the final arguments that the jury was led to believe that the plaintiff must prove wilful and wanton misconduct in order to succeed. Whether or not the jury had been given an instruction that the general negligence count was no longer involved in the case, the ruling of the trial court being erroneous in our view necessitates a reversal. It is not correct to say, as defendant contends, that the plaintiff acquiesced in the ruling of the trial court in directing a verdict against him as to Count II, as he raised the point in his post trial motion.

■ Several errors are assigned with reference to Count I which was permitted to go to the jury. Plaintiff tendered his Instruction No. 5, which, with certain changes pointed out by the parties in their briefs, could be made to conform to an instruction approved in Wolf v. Budzyn (1940), 305 Ill. App. 603; 27 N.E.2d 571. The

261

other instruction refused, plaintiff's Instruction No. 7, relates to admissions in the pleadings, which may or may not be in the same condition in a retrial of this cause. The asserted error with which we are more concerned relates to the ruling of the trial court permitting the treating physician, Dr. Bertelson, to be asked certain questions which invaded the province of the jury. Dr. Bertelson had admittedly viewed the scene of the accident and was familiar with the condition of the premises as well as the physical condition of the plaintiff. The doctor was permitted to be interrogated at length as to his opinion regarding the manner in which plaintiff sustained the injuries complained of. The answers called for the expression of the doctor's opinion not only on matters which were not the proper subject of testimony in the medical field, but it is obvious from a reading of the record that the questions and answers intermixed actual fact with hypothetical fact. Where, as in this case, the interrogation by defendant's counsel of the treating physician alternately included matters which the witness had actually observed with regard to the plaintiff and the pond site and various hypothetical questions as to how plaintiff's injuries might or could have been caused, the resultant answers are of doubtful meaning.

■ In addition, the trial court refused to admit into evidence certain paid and unpaid medical bills incurred by the plaintiff. These bills, which were tendered by the plaintiff and which the court refused to admit, totalled in the aggregate $5,435.12. It appears that certain of the medical bills and expenses of the plaintiff were paid by the plaintiff's parents and certain ones by the Illinois Public Aid Commission. The basis of the refusal to admit these bills apparently was that these bills were not paid by the minor but by others and therefore the minor plaintiff should not be permitted to recover upon them. The court

refused to permit the introduction of plaintiff's Exhibit No. 55, which was an assignment of claims for part of Willard Skaggs' medical expense by his parents to him and an emancipation of their son, and further refused to allow the plaintiff to amend his complaint during trial to show that assignment. We believe that the failure to recognize and give effect to this assignment of claims and permit the introduction into evidence of paid medical bills, as well as unpaid medical bills which were shown to be fair, reasonable, and necessary to the treatment of the plaintiff, constituted reversible error: Wicks v. Cuneo-Henneberry Co. (1926), 319 Ill. 344, 349, 150 N. E. 276. The Illinois Public Aid Commission, pursuant to statute, had perfected its lien rights in connection with any claim which it might have pertaining to plaintiff's treatment. Under the circumstances, not to permit the plaintiff to seek an entire recovery when his parents were in agreement with such a procedure and when the rights of the Illinois Public Aid Commission were protected, seems an abuse of discretion. See Romine v. City of Watseka (1950), 341 Ill. App. 370, 91 N.E.2d 76, and authorities cited therein.

In view of the foregoing, without commenting on other errors assigned, it is our conclusion that justice requires that this cause be reversed and remanded with instructions to proceed with a new trial upon Counts I and II of plaintiff's complaint.

Reversed and remanded.

JUDGE SPIVEY took no part in the consideration of this case.